MILLIE BARKALOW, Administratrix, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

RAILROADS: Accidents at Crossings—Race to Beat Train. A traveler, in going upon a railway crossing in the presence of a known dangerously near and rapidly approaching train, is necessarily guilty of negligence when, in the last analysis of the facts, it is clear that he was entering into a race to get over the crossing before the train passed.

*Appeal from Johnson District .Court.—*RALPH OTTO, Judge.

FEBRUARY 12, 1924.

ACTION in tort by plaintiff, as administratrix of the estate of William Barkalow, deceased, to recover damages alleged to have been sustained by his estate from injuries causing his death in a collision between defendant's train and an automobile operated by decedent at a street crossing in West Liberty, Iowa. Cause tried to a jury, resulting in a verdict in favor of the plaintiff in the sum of $6,379. From the judgment entered thereon, defendant appeals.—*Reversed.*

*J. G. Gamble, R. L. Read,* and *Messer, Clearman & Olsen,* for appellant.

*E. J. McIntosh* and *R. P. Howell,* for appellee.

DE GRAFF, J.—This appeal presents questions involving the negligence of the defendant-railroad in the operation of its train at the time and place of the accident, and the contributory negligence of the plaintiff-decedent in driving upon the railroad track under the circumstances. The accident occurred at the intersection of the railroad tracks and Columbus Street in the eastern part of West Liberty, Iowa. The street is paved with brick. The collision occurred January 26, 1921, and the street at that time was in good condition and dry. It is a north and south street, intersected by the railroad tracks at almost right angles. At this point there are three tracks: the north being the west-bound main track, the middle being the east-bound main track, and the south being a passing track. The accident occurred at approximately the center of the intersection of the street and the west-bound main-line track.

The auto was being operated by the decedent, who was well acquainted with the tracks, and a skillful operator of the car. The auto was equipped with a winter top, consisting of side curtains with glass windows in them. The brakes were in good order. Three persons were riding in the car at the time: the decedent, his son Elmer, and one Joe McFadden. They had

been in attendance at a sale at a barn but a short distance north and east of the crossing. Decedent sat in the driver's seat at the left front, and the two other occupants were in the rear seat. All windows of the car were closed, except the left front, opposite the driver. The car had traveled east a block to the intersection of Third and Columbus Streets, and then turned south on the latter street, moving at a rate of about 15 miles an hour. The speed of the car was not changed as it approached the intersection. All of the occupants of the car were familiar with the crossing. Elmer Barkalow, the only survivor of the accident, testified that they all looked first to the east, at a point approximately 100 feet north of the crossing, then to the west, and then to the east; and when the auto was at a distance approximately 58 feet north of the track, all three saw the train approaching from the east, running very fast.

The topography of the situation discloses that on the east side of Columbus Street the view to the east is obstructed until a south-bound traveler along the highway reaches the point about 100 to 110 feet north of the west-bound main-line track. Upon reaching a point about 100 feet north of the west-bound track, the view toward the east is unobstructed. It is further shown that east of Columbus Street the railroad runs into a slight cut, on the north bank of which were some dead weeds, that did not obscure, and that 26 feet north of the north rail of the west-bound track is a tool house, 10 1/3 feet in width north and south, and 14½ feet east and west, and 14 feet high to the peak of the roof. East of the tool house, 16 2/3 feet, stood a bunk car 34 feet long, 8 2/3 feet wide, and 8 feet high from the ground.

The estimate of the speed of the train is from 30 to 45 miles an hour. The engine was equipped with a whistle and an automatic bell. There is some dispute as to whether the bell was being sounded, but there is no serious conflict in the evidence that the whistle was blown in a manner and under such conditions that constituted a warning of the approach of the train. In fact, the trial court sustained a motion to withdraw from the consideration of the jury the charge of negligence based on the failure of the defendant to cause the whistle of the engine to be sounded in approaching the crossing; but, in the state-

ment of the issues, and also in Instruction No. 3, the failure to blow the whistle is an item of negligence submitted to the jury. Under the record, we are not primarily concerned with the specifications of negligence against the defendant, but with the negligence, if any, of the plaintiff's decedent, and, as alleged, contributing to his own injuries and death.

The right to recover in a case of this character must be predicated upon the facts disclosed by the testimony, and prior decisions are of little help in reaching a correct conclusion. Was plaintiff's decedent guilty of contributory negligence as a matter of law? Plaintiff's intestate was a man of mature years, and possessed of all his natural senses. He was intimately acquainted with the railroad crossing, and a competent driver of his automobile. There was no diverting circumstance. It was daylight. The condition of the street was good, and the weather conditions tended in no way to make it difficult for him to see or hear. It is shown that the car could have been stopped within a distance of from 15 to 18 feet. The panoramic photograph introduced in evidence, and which is unquestioned, taken into consideration with the oral testimony, discloses that an unobstructed view to the east is afforded the traveler approaching the crossing from the north, from a point at least 100 feet north from defendant's west-bound track. Elmer Barkalow testified that all of the occupants looked to the east when the car was approximately 100 or so feet north of the track. He is positive his father looked at this point, and he says there was no train visible when they looked. We are justified in assuming that the train was moving from 2½ to 3 times as fast as the automobile, and, when the car was 100 feet north of the track, the train must have been from 250 to 300 feet east of the center of the crossing. The engine was about 15 feet high. The bank in the cut was at no place, up to 400 feet east of the crossing, higher than 6 feet. The testimony of the civil engineer who took the measurements shows that the cut begins about 100 feet east of Columbus Street, and that, 200 feet east, the north bank of the cut is 2.1 feet above the top of the ties, and maintains a uniform slope, gradually rising; and at 300 feet east, the top of the bank is 4 feet above the ties; at 400 feet, is 6 feet above the top of the ties; and at its highest point, 550 feet east, it is 8 feet and 1 inch

above the top of the ties. One witness, a resident of West Liberty, and not connected with the railroad, and disinterested, so far as the record discloses, made certain observations, and testified that, when he stood 100 feet north of the track, in the center of Columbus Street, he could see an engine 700 feet east of Columbus Street, and at 600 feet, it was plainly in view, as well as at all points 600 feet east of Columbus Street, and up to the point near Columbus Street where the engine would pass back of the tool house.

The decedent saw this train when the automobile was not less than 58 feet from the crossing, and no effort whatever was made to stop the auto. Assuming that the train was moving 3 times as fast as the car, it must have been 174 feet east of the crossing when the occupants of the car saw it. The physical condition disclosed that Barkalow must have been farther north of the crossing when he saw the engine, as the angle of vision, under the circumstances, does not warrant any other conclusion. When the auto reached a point about 25 feet north of the track, the train would again become plainly visible to the occupants of the car, and at this time the driver knew that the train was approaching, and was moving fast. No effort was made to stop the automobile and avert the accident. He had every opportunity to safeguard himself, but apparently entered into a race to get over the crossing before the train passed. We cannot hold, under the circumstances, that his act was the act of an ordinarily prudent and cautious person. The physical-fact rule must control in this case, and upon its application it must be said that the decedent was guilty of contributory negligence, as a matter of law.

It is true that one about to cross a railroad track has the right to assume that a train approaching a crossing will not be operated in a negligent manner, and that the agents of the railroad company will comply with the rules of law prescribed for the operation of its trains. This does not permit, however, a person in approaching a crossing to disregard known facts or excuse himself in the exercise of ordinary care on his part. The question of contributory negligence is ordinarily for the jury; but when the evidence shows that the conduct of him who uses a highway is such that it negatives the exercise of care of a rea-

sonably prudent person, then a court is justified in directing a verdict. A traveler on a highway has no right to rely on an assumed state of facts when the known facts demonstrate that the contrary is true. Decedent knew that a train was approaching, and traveling at a rapid rate. He drove right on at the same speed. The tragedy resulted because he failed to exercise the caution and the care that the law imposes upon the reasonably prudent person.

The judgment entered must be reversed, and it is—*Reversed.*

ARTHUR, C. J., PRESTON and VERMILION, JJ., concur.